McNamara, Ricky Armstrong, McClennan County Jail, Robert Dillard, McClennan County, who's also of the County Jail, and Officer Jeremy Johnson. Mr. Lieberman, you may proceed with your argument. Your Honor, and may it please the Court, Michael Lieberman on behalf of Plaintiff Appellant Andre Boyd. This Court has already held on multiple occasions that an officer may not use a taser in the course of handcuffing somebody if that person is not actively resisting. And so the key question in this case is really whether a jury, a reasonable jury, could watch the video, look at the evidence in the summary judgment record, and conclude that Mr. Boyd was either passively resisting or not resisting at all. And I think the answer to that case, the active resistance versus passive resistance versus no resistance question, the answer to that question is also dictated by this Court's cases. I think Ramirez and Trammell especially are conclusive here. Those cases both involved an officer reaching out to handcuff somebody, the person pulling their arm away, saying something, you know, that they weren't going to cooperate, saying I'm not going to jail, something along those lines. The officer is then resorting to physical force immediately, and in both of those cases this Court found passive resistance, excessive force, and a violation of clearly established law. And I don't think there's any basis to distinguish this case from those cases. Here I think, and actually I don't even think the county has pointed out any distinctions between the cases in terms of the level of resistance, and I think this case is actually a lot easier than those cases. And that's because in those cases you never even have kind of a moment in which the individual was looking like they were going to cooperate or showed kind of any signs of cooperation at all. In Trammell, for example, this guy fell off his motorcycle, he was wobbling around drunk, he pulls his arm away twice, shouts I'm not going to jail, and then the officers use force. So there's never a moment there where it looks like he's going to cooperate, and still that was passive resistance and still that was excessive force. Here of course we have the same moment where Boyd pulls his arm away, but right before that he kind of undisputedly walks calmly to the door, turns around, puts his hands behind his back, and is ready to be handcuffed. He then does pull his arm away when his hand is grabbed, but then after that he again puts his hands behind his back. And so unlike— The same hand that he had that broken injury, right? I'm sorry, I forgot the details. That's right. So Officer Johnson reaches out— Which the officer knew. Correct. Right. So I guess to back up a little bit, a few minutes before all this happened, Boyd was escorted to the nurse's office. He had hurt his hand while being arrested originally before he came to the jail. And the nurse examined his hand, looked at it, eventually an x-ray was ordered, she called the medical provider who then ordered an x-ray, it later turned out to be a fractured finger, so it's kind of undisputed he had a broken finger at the time. And while the nurse was examining his hand, Officer Johnson undisputedly was standing there watching the interaction, and he's never disputed that he knew the finger was broken. So he reached out and grabbed the broken hand, and I think that's the second reason why this case is kind of simpler than Ramirez and simpler than Trammell and the other cases, is here the officer had a particularized reason to know why this person pulled his hand away. In Ramirez and in Trammell, the officers reasonably thought that the person who was pulling their arm away was doing so out of resistance, rather than any other reason. And it was passive resistance, but I think undisputed in those cases that it was some level of resistance. Whereas here, because of the injured hand, which the officer knew about, I think the best inference is that it wasn't resistance at all. It was kind of not wanting to be arrested in a way that would, you know, further injure his broken finger, but it wasn't resistance to the arrest itself. And that's another distinction that I think makes this case a lot easier than those cases. Could you tell us what relief you seek in which of the claims, please? Sure. So in this court, you know, we're seeking reversal of the judgment below, which would kind of get us back to the district court on the claims for excessive force. And then we also have the kind of Monell claims against the county and the individual liability claims against the supervisors, not Officer Johnson himself, who is the defendant for the excessive force claim, but the supervisors who we allege instituted an unconstitutional policy. The deliberate indifference that stays, that stays as the judgment? The deliberate indifference claim is still live. It was briefed kind of in the pro se briefing, the first round of briefing in this case. I haven't kind of added to the briefs on that topic. You didn't. And so that you assume that to the extent that it doesn't make a claim, that one should be affirmed? Yeah. I don't want to stand here and waive the claim on behalf of the pro se. I understand you're not here to waive the claim, but I'm asking if there — you're not also arguing summary judgment evidence that you have on that claim? Right. I guess I would stand behind what was briefed by the pro se level. Thank you. On the supervisory claims, the opposing counsel, your friend on the other side, says this is not that case. Do you want to respond on that, the supervisory liability? Sure, sure. So they're — I think the briefing is kind of — the county's briefing is a little bit confused on this. I think they think — they view us as bringing kind of a vicarious liability claim, trying to charge the two other officers for what Officer Johnson did. Our claim is a little bit different than that. Our claim is that there is an unconstitutional custom policy or practice at the jail of a disproportionate use of the tasers on minority inmates, on black and Hispanic inmates. And the allegation is that these two officers were personally involved in setting up that policy or in furthering that policy. And so kind of just under Section 1983, they themselves can be individually liable for that. And that's that claim. So the vicarious liability claim, we don't have — there isn't a vicarious liability claim in this context, but kind of a direct liability for — Right. For personally — What is the evidence that supports that, that there is such a policy? Right. So, I mean, I can't say we have a lot of evidence now because the court didn't allow us to seek discovery on that topic. We have allegations in the complaint, and there's kind of some evidence in the record that was produced in response to the excessive force issue that I think is kind of like — gives us a little more of a leg to stand on there. But really what we want is to get discovery on that claim. We've requested kind of incident reports from the jail over the past several years, roster of the people in the jail and the demographics of the jail more broadly, so we can kind of do a comparison and see if there is, in fact, a differential treatment that we've alleged. And do the district court deny requests for discovery that was made by your client, who was pro se on these topics, correct? That's right. On that topic. The district court allowed some discovery on the excessive force issue and on the qualified immunity issue related to excessive force, but then denied the discovery requests that were specific to the policy — On what basis? I think the general rule, which kind of we don't dispute, sorry, is that when an officer asserts qualified immunity, discovery should be limited to the qualified immunity issue at the outset to kind of prevent the case from growing too big and forcing the officers to engage in kind of the civil litigation process before qualified immunity is adjudicated. And so we don't have really a dispute with the discovery order itself limiting discovery to the qualified immunity issue at the outset. But if this court were to reverse and remand for — and let the excessive force claim go forward and decided that there was, in fact, excessive force or at least the excessive force claim should go to the jury, then we think we're entitled to discovery on the policy and practice claim at that point. Can I ask about that last piece? So the district court didn't rule on, like, a motion to dismiss on the policy or practice part for the reasons that you just gave. But I would assume that before you get the discovery that you just mentioned on the policy or practice, you would need to survive 12b-6. And I realize it's a pro se complaint, but I'm looking at the allegations, and I would assume you'd agree with me that these wouldn't satisfy Iqbal and Twombly, at least as they're written now, as to the policy or practice. I think we'd probably want to amend if there's counsel when we go back down. I do think, you know, this is someone who is in the jail and, like I said, is talking to all the other inmates in the jail and is viewing these things firsthand, so it's a little bit different than some lawyer alleging that there's a disproportionate practice. This is someone who's kind of lived this experience, and he's pro se, of course, so I don't think they're, like, just so facially bad they go away. But I do think it would make good sense for us to amend when we go back down and beef those up a little bit. So there would be an intermediate step between — if you were to prevail on the first part, the excessive force claim, it would go back, and then before there would be discovery, in your view, as to policy or practice in Monell, there would be some repleting, basically. Right. We would seek leave to amend. And Mr. Brandt or whoever would have the opportunity to file a 12b-6 at that point in the regular order of things, if that were to happen. That's right, Your Honor. Do you have anything? Do you have anything further, Mr. Lieberman? I do just want to address the jurisdictional question very briefly before I sit down. I just want to kind of respond to one point in the county's reply brief. They cite a few cases, and they seem to suggest that a declaration like we submitted, the court granted us leave to file the Boyd Declaration to show timely filing. They suggest that a declaration like that standing alone is not enough to establish jurisdiction, and I just want to be clear that it absolutely is. That's what Rule 4 says. The cases they cite for that proposition are cases where an affidavit was filed, but the affidavit didn't actually list the date on which the motion was handed to someone with the jail. So that's why it wasn't good enough. In another case, Rule 4 says that if the jail has a separate system for legal mail and a separate system for general mail, you have to use the legal mail system. And in that second case, the individual used the wrong mail system. Here there isn't kind of those separate systems. We don't have that issue. And so the cases are very clear, and the rule is very clear that a declaration that kind of satisfies the Rule 4 standard and is, you know, under penalty of perjury and checks all those boxes is standing alone enough to establish jurisdiction. So I just wanted to clarify that one more time. Thank you. We have time for rebuttal. May it please the Court. Tom Brandt for Sheriff McNamara, Captain Armstrong, Officer Dillard, and Officer Johnson. This case involves one routine decision followed by three separate split-second decisions made over the course of nine seconds, beginning at 10.25.32 and running to 10.25.41 on the video. First, the routine decision. The routine decision was that Officer Johnson was encountering, was with the appellate, Mr. Boyd, and he was, Mr. Boyd was experiencing withdrawal from benzodiazepine. He was agitated, angry, and arguing. The routine decision was to say, all right, sir, Mr. Boyd, you're not going to be in this cell with all these other 10, 15, 14, 15 other cell mates. We're going to take you to another cell. That's an appropriate routine decision when someone is acting in an aggressive, agitated manner. The beginning of that process was still routine. Turn around, put your hands behind your back. The application was routine. In other words, Officer Johnson directing the arms so that he could place the handcuffs on them. There was nothing objectively unreasonable about trying to accomplish the handcuffing. It was then that the nine seconds begins. At that point, there is a sudden movement, turning, and yelling. That, regardless of the subjective reason that Mr. Boyd may have had for that, the objectively reasonable officer in Officer Johnson's position can perceive that reasonably as a threat. At that point, there is... A reasonable, objective officer who knows that his hand is broken? I'm sorry. I forget the nature of the injury, but I assume the injury is not disputed. I don't dispute the injury. What I'm saying is that the action of Officer Johnson was objectively reasonable to reach for the hands to accomplish the handcuffing. If in the process... If they know that he's got a broken finger at the very least at that point, what shouldn't an objective officer be ginger with the hand? We ask, I need to handcuff you, but I know you've got this broken finger, so let's see if we can get this... A reasonable officer would need to take that into account, wouldn't he or she? That, I think, would be reasonable to do, yes. But it still doesn't change the factual matter about what Officer Johnson needs to do. He needs to affect the handcuffing in a ginger way, but he needs to do it. And there is no evidence that... There's no factual allegations that there was anything that Officer Johnson had, any ill will to this fellow. He had, after all, escorted him to the nurse, attended to him, escorted him back. I do not want to concede that he knew that this was a broken finger. I'm not disputing that it was, but the evidence doesn't support that he knew it was. But let's just, for the sake of argument, say, okay. But he was caring for this... Well, that's a fact dispute in any event. There's not a fact dispute that the finger is hurt. But there's no evidence, I think, in the record that Officer Johnson was listening in to the private medical conversations. Why is that not a fact dispute? He was in the room. It sounds like it's undisputed that the finger was, in fact, broken and that it caused pain. It's undisputed that the officer was in the room. The fact dispute is the knowledge piece and whether that feeds into objective reasonable conduct. Right, so there's no evidence... That sounds like a fact dispute, a material fact dispute. There's no... Officer Johnson... It's not a fact dispute because there's no evidence in the record that Officer Johnson admitted that he knew that there was... Well, he doesn't have to admit it. There has to be circumstantial evidence in the record that of which he was aware. And the fact that he was standing right there in the room while the nurse treated him is some circumstantial evidence on the other side of the ledger. Right. And we put our evidence into before the district court. But nevertheless, at that point, it's assuming that he needs to behave in a ginger manner. He still has to behave in a manner that accomplishes the task. So that task, there's no... That task is to put the hands behind and cuff them. At that point, then, the reaction that he sees is a reaction that he's entitled to perceive and to interpret and to make a decision about what to do next. He then realizes, okay, suddenly... Again, this is when the split-second decisions come on. There are three discrete decisions. The first one is I'm going... He's moving. He's turning. He's yelling. He's looking at me. It's threatening. Okay. I've got to gain control as the officer. I've got four inmates immediately surrounding the situation, me, and then the fifth is Boyd. I've got ten other inmates in the cell. I've got to immediately gain control of the situation. It's getting out of hand. So he then... You can see on the video, which you have a front row seat just like the district court has to this whole thing from two different camera angles. So at that point, he's getting... He's dropping... He's trying to drop his handcuffs and move to the taser. And then he has to change the taser to another hand so he can deploy the taser. So it's sudden movement, a decision to use the taser, and then implementation of that decision, which takes some time. That chews up some time, but he then deploys the taser. Then comes the second decision point because he realizes, and you can see, it's clear on the video, that the taser has no effect. And the reason it has no effect is because one of the barbs is not... It has to have both barbs to be effective. But if there are both barbs in there, you would see a paralysis occurring because the charge from the taser would paralyze Mr. Boyd, and he would probably fall to the ground and be subdued. But it doesn't work, and the movement continues. At that point, he makes a second split-second decision, and that is to give verbal commands. Stop moving. Stop moving. The movement doesn't cease. So then he goes... What do you mean by that? You can see on the video... We've all seen the video. When you say the movement continues, what I saw, and what I think a jury is at least reasonably entitled to see, is a jerk motion, exactly what you said, and then a return to him being ready to be cuffed. Are you saying there was a second movement, or are you saying it's all... You have to look closely, but there's movement. There's movement of the body and the head. Plus, there's no volume, but there's no sound. But there's the agitation that preceded that. The situation is not like you can just say, okay, it's over, now we have peace. No, it's constant. It's a constant, evolving, tense, uncertain, and rapidly evolving situation. So he then tries to gain control of him, because he can't immediately go to the drive stunt, so he says, stop, don't move. And that is continuing, and then he goes, the third decision, okay, I'm going to have to drive stunt him. And he does. And at that point, then after that, the nurse looks at him, examines him, says, no need for medical care. That's it. Now, in answer to your question, Judge Hope, you've looked at the video. The district court fully considered the video from two angles, and the district court judge decided there was no constitutional violation at all. Didn't even have to reach the clearly established prong. What that tells you, as a matter of law, a reasonable judge, who certainly has more knowledge about the law than any jailer, looking at this does not see a constitutional deprivation. That means it can't possibly be a clear... That cannot possibly be... It cannot... No, what you just said cannot possibly be right. That once a single judge decides what the Constitution is, no other judge is entitled to impose liability? What it tells you is that... It cannot possibly be right. What it tells you is that you can't hold jailers to a standard that federal judges... That means that judges sometimes disagree with one another. Yes, and if judges disagree with one another, then Officer Johnson is entitled to qualified immunity. Sounds to me an insane theory of liability. I taught my students in civil procedure two weeks ago, Scott V. Harris, and Scott V. Harris applies if the video is undisputed, that if the video establishes something as a matter of law, then the video overrides things. It doesn't mean if different people look at the video and think different things, that you're entitled to qualified immunity. That is not part of Scott V. Harris. It only overrides if no one could... It refutes something that would have been a fact issue. It doesn't mean that if one person watches the video, it makes a determination, because there are other judges who might watch it and say it's not clear. The lack of clarity does not mean entitlement to qualified immunity. Scott V. Harris is not tied to qualified immunity in that way, under our case law. Do you have a case that says Scott V. Harris is tied to our case law in that way? Even though we have voluminous qualified immunity case law, I've never seen it tied in that manner. The second prong of qualified immunity is the clearly established prong. Does that mean you don't have a case that ties Scott V. Harris and qualified immunity? I'm trying to answer your question. I thought you said it was a first prong situation. I was going from first to second prong. You're saying you don't think Scott V. Harris controls, but I'm saying is, okay, even if that's correct, the second prong that all they have is Ramirez, Hanks, and Trammell. That's all they have. But what I'm arguing is not only do those cases not clearly establish the law, but the standard is every reasonable officer facing these circumstances would have concluded that Officer Johnson's conduct was violative of clearly established law. And what I'm arguing to the court is he hasn't met that standard. And one of the arguments I'm making is that he obviously hasn't met that standard because there is disagreement, at least on the district court level,  so you can't possibly have a clearly established violation of the law if a judge and other individuals, other reasonable jailers, would not know it in a split second, in the blink of an eye, that this decision, these series of decisions over nine seconds, was so out of the bounds that it was violative of clearly established law. Well, let's talk about the nine seconds, because I certainly agree with your underlying premise, which I'll explain in a moment. The question is whether that premise, how that applies to this case. The premise that I think you're putting forth and that I strongly agree with is that we don't impose on police officers acting in good faith James Bond-like reflexes. We allow for split-second difficult life-death-type reactions when there is, in fact, a reasonable notion of a threat. I strongly agree with that. The question is, what is the evidence here that indicates that this officer could have reasonably concluded that there was such a peril? Because what I see on the video, at least a plausible interpretation, is that the inmate had a negative reaction to being harmed, based on an injury that we can plausibly impute to the officer. He then returned to being ready to be handcuffed. And it was, you're right, only a few seconds. But I see no real threat at all, other than that jerking motion. So my question, sorry for the long wind-up, but here's my one question. Is it just the one jerk, or is there some other perceived threat? Okay, what's that threat? That's why I started with the routine decision first. No, no, I get your routine. We're talking about the nine seconds. Yes. Other than the jerking motion, because we're now in the nine seconds. Other than the jerking motion, is there some other plausible source? Your audience don't want to hear what that source is. To be precise, when you're looking at the video, you'll see the different motions. At 1025-31, jerks left arm away, and he reaches to use his taser. Then Boyd is sideways to Johnson at 1025-38, and is turning his head towards Johnson. When the taser's being deployed, he's not supposed to be turning towards Johnson. That's at 1025-38. And at 1025-41, Boyd is sideways to Johnson, looking over his left shoulder, and Johnson's pushing Boyd with his left leg, right arm down, and Boyd's right leg then drives down. So that's what you're seeing at 1025-41. Boyd is sideways to Johnson. He's not supposed to be sideways to Johnson, and he's looking over his left shoulder. He's not supposed to be looking over his left shoulder. He's supposed to be complying. So this is all in the context. It's not just the jerking of the hand. You're saying it's his body turning. Yes. We don't have audio, but it appears that what he's doing, and you tell me why you disagree with this, it appears to me what he's doing is reacting to what I assume is pain, and trying to explain to the officer or your client, I assume something effective, please don't touch me in that way, it really hurts. It's not crazy for somebody in that instinctive mode to turn and want to engage somebody. My point is he then turns back and seems to return to a more docile posture. That's why I'm saying at 1025-41 he's sideways to Johnson. He's looking over his left shoulder at Johnson. That's not compliant, and in the context of the situation, larger context, it's reasonable for a police officer to Let's stipulate that, you may not want to read the stipulation, but I need it for the purpose of analyzing the case. Let's stipulate that he was in fact in pain, and that he was reacting to the pain. What would you have him do? Well, I won't stipulate to that because I know he wasn't. You don't have to answer my question, but it is a question. No, but I'm sorry. The reason I'm not stipulating to the fact that he was in pain at that point is because the deployment of the taser, the first effort to deploy the taser didn't work, so there was no pain inflicted by that first deployment. Can you treat it as a hypothetical and please answer the question, because it's a question I have. Okay, yes. Okay, so if you stipulate that he was in pain, Answer when there are two members of the court. I'm just trying not to make No, I was No, I want to make clear that we don't think he was in pain. Okay, it could be a natural response to pain to wiggle or move. Yes, but that's not the point. The point is what is the reasonable perception of the officer in that split second? That's the question, and that's the objective question that the district court answered in favor of Officer Johnson, saying, okay, I know you might be reasonable in squirming or turning or yelling.  But from the officer's perspective, and he's surrounded by inmates, and he's trying to gain control, and in that situation, it's objectively reasonable for him to drive stunts. The best argument you can have in a situation like this is the officer needs a better protocol. When you have somebody who has a physical injury, it creates pain when you try to handcuff him. The officer was doing the best job that he could. Both sides have good arguments, but it's not the officer's fault. That's not the argument I'm hearing. What I'm hearing is that what you're saying is Mr. Boyd behaved unreasonably, and I think a jury could plausibly conclude that he was behaving like a human being. I think that the question is, did Officer Johnson behave in a manner that was objectively unreasonable given his perception of the situation at the time? And if there was another protocol, there would— What would you have Mr. Boyd do? I get that this case is about Johnson, so— but I do wonder what— is the idea basically that inmates who have these broken fingers just have to take it? Is that sort of the theory? Give me something. Yeah, I think that what you're suggesting earlier is appropriate, that there are procedures that perhaps could be adopted in certain circumstances where if a finger is broken, then a new protocol is in place. But I do think that Officer Johnson was doing the best he could in a situation that was spinning out of control. He knew, and it goes back to the agitated state, he knew that this man needed to be removed from this setting, and he needed to accomplish that. He'd been trained how to do that. You handcuff the guy. You take his hands, you put them behind the back, handcuff him and walk him to the next place. And in that situation, it rapidly goes out of control. And I think that it was reasonable for the officer, in this case, to try to gain control of the situation. And I see my time is up. Thank you. Mr. Brandt, I want to make sure that you had an opportunity to address the opposing counsel, your friend on the other side, addressed your motion, the jurisdiction of this court. Yes. But vary in one or two sentences, because your time is up. Yes. The two sentences would be, the court has no jurisdiction, but if the court thinks there's a fact question, then it needs to be remanded for an evidentiary hearing to weigh the credibility of the witnesses by the district court, and then determine whether or not the Rule 59 e-motion was filed, submitted in a timely manner to the jail system. Thank you. Thank you. Just three quick points, if I may. The first thing I heard my friend come up here and say is that Officer Johnson was entitled to react to Mr. Boyd pulling his arm away, and perceived that as a threat. This court has already expressly said that's not the case in Ramirez. Pulling one's arms out of an officer's grasp without more is insufficient to find an immediate threat to the safety of the officers. That's directly contrary to what he just stood up here and said. That's 716 F3rd at 378. The second point, there's no audio in the video, so we can't hear what Boyd was saying when he pulled his arm away, but his summary judgment affidavit at page 427 of the record, he says what he said was, you grabbed my injured hand, can you please not grab my injured hand? If you're going to handcuff me, grab my wrist and not my finger. So he's not only explaining to Officer Johnson why he pulled away, which kind of refutes any notion that there was resistance, but if Officer Johnson didn't remember what had just happened a few minutes earlier at the nurse, that would have reminded him. And Officer Johnson would have then, a reasonable officer at least then, would have then said, oh, that's what happened. And his hands are behind his back again now. Great, let's complete the handcuffing, not let's tase this person. And then the final thing is on the clearly established point, my friend came up here and said that all we have is Ramirez, Hanks, and Trammell for clearly established. I think three cases is pretty good in this context, and I didn't hear him either today or in his brief point to any distinctions between those cases or any reasons why those cases wouldn't clearly establish the law here. So for that reason, we ask this court to deny the motion to dismiss and reverse. Thank you. We have your arguments, and this case is submitted.